UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
ESHWAR HARRIPERSAUD,

              Petitioner,

    - against -

WARREN BARKLEY, Superintendent,
Cape Vincent Correctional Facility,

             Respondent.
-------------------------------------------------X
GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**
**04-CV-4035 (NGG) (KAM)**

Petitioner Eshwar Harripersaud ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254. In his petition, filed on September 17, 2004, he challenges the

constitutionality of a judgment entered against him in the New York State Supreme Court,

Queens County. Having reviewed the state court record and the parties' submissions, for the

reasons set forth below, the Petitioner's writ of habeas corpus is DENIED.

I.    **Background**

Petitioner and two co-defendants, Ramkrishine Haripersaud ("co-defendant

Haripersaud")[1] and Ganesh Punwa ("Punwa"), were charged under Queens County Indictment

Number 246/01 with one count of robbery in the second degree (N.Y. Penal Law 160.10[1]) and

one count of criminal possession of stolen property in the fifth degree (N.Y. Penal Law 165.40).

Petitioner and the two co-defendants proceeded to trial before the Honorable Joseph Rosenzweig

and a jury found them guilty of the crimes charged on January 14, 2003.

_____

[1] Co-defendant Ramkrishine Haripersaud is not related to the Petitioner, Eshwar
Harripersaud.

**A.       The Trial**

The Petitioner was convicted of robbery and criminal possession of stolen property for

events surrounding the robbery of a man named Rudolph Alli ("Alli"), which occurred in the

early morning hours of January 20, 2001 near a bar called the Golden Arrow, located in Queens

County.  At trial, the People called Alli to the stand, as well as an NYPD Detective who was at

the bar at the time of the incident and was involved in the investigation that followed.  The

Defense offered several witnesses, including the Petitioner's two co-defendants.  The evidence

adduced at trial is recounted below.

**1.       Testimony of Rudolph Alli**

The victim of the alleged robbery, Rudolph Alli, was the first witness for the Prosecution.

On January 20, 2001, Alli was living at 107-14 101st Avenue, above the Golden Arrow Bar.  (Tr.

300).  Alli regularly frequented the Golden Arrows Bar, and was there on the evening of Friday,

January 19, 2001 into the early morning hours of January 20, 2001.  (Tr. 301).  On the night in

question, he was wearing numerous pieces of jewelry including three chains, bracelets, and six or

seven rings.  Some of the rings had his initials "RA" imprinted on them.  (Tr. 302).  Alli's father

owns jewelry stores and sells jewelry in Alli's native Guyana, and thus wearing a lot of jewelry

was typical for Alli when he went out socializing. (Tr. 302).  Alli was also carrying his wallet

and approximately 350-360 dollars cash in his pocket that night.  (Tr. 303).  In the wallet, Alli

had a fake identification card ("ID")[2] with his photo on it, and a birth certificate of a friend from

---

[2] On cross-examination, this ID was inexplicably referred to numerous times as a "metro
card."  (See Tr. 363-66).

Canada which matched the name on the fake ID. (Tr. 303-304). In the wallet was also a library card, a social security card that Alli's "friend left by [him]," a Rite Aid card, pictures of his family, and a business card of his father's. (Tr. 305).

At approximately 12:30 a.m. on the morning of January 20, 2001, Alli was in the Golden Arrow Bar with his wife and his sister-in-law and her husband; he had consumed about two beers. (Tr. 306). He received a call on his cellular phone from a friend and stepped outside to take the call. (Tr. 306-7). On his way out of the bar, Alli saw police officers coming into the bar. (Tr. 306). While standing outside on the phone, Alli was approached by Punwa, with whom Alli was familiar and had seen at the Golden Arrow on prior evenings and earlier that same evening. (Tr. 307-8). Punwa indicated to Alli that he wanted the two of them to take a walk to the corner of 107th Street, and when Alli got off the phone he did so. (Tr. 308). The two rounded the corner of 101st Avenue onto 107th Street, at which point Alli noticed the Petitioner and co-defendant Haripersaud, both of whom he also recognized from patronizing the Golden Arrow Bar and from having seen them with Punwa at the bar earlier that evening. (Tr. 309-10, 341).

According to Alli, at this point all three defendants started to beat him up, punching him in the face, kicking him, and pulling his chains off of his neck. (Tr. 311). Alli testified that co-defendant Haripersaud was also "pushing his hand into [Alli's] pocket." (Tr. 311). The defendants, Punwa in particular, then dragged Alli, who was on the ground, by his left foot "halfway to 107 Street" and then left Alli there and ran away, towards 103rd Avenue away from the bar. (Tr. 311-13). Alli testified that all three defendants stole his jewelry, specifically "about three chains," three bracelets, six or seven rings (some of which had his initials on them), three diamond earrings, and one pendant that was on one of the chains. (Tr. 312-13). Co-defendant

Haripersaud took Alli's wallet and the money that Alli had in his pocket. (Tr. 313).

Alli then made his way back to the bar and reported to the police officers who were there that he had just been robbed around the corner. (Tr. 314). Alli provided the police with a description of his robbers and the direction in which they had fled. (Tr. 314). Alli was escorted in a police car and identified the three defendants in the vicinity of 101-59 107th Street. (Tr. 315). The police showed Alli his wallet, his chain and two of his rings which had his initials on them. (Tr. 316). At trial, Alli identified that jewelry and wallet as his possessions which were stolen from him that night by the Defendants. (Tr. 317-19). He admitted that in his wallet he kept a fake ID, with a photo of himself and a friend's name and a copy of his friend's birth certificate that matched the ID. (Tr. 322).

During his direct examination, Alli admitted that on January 3, 2002 he pled guilty to a misdemeanor assault charge for striking his wife. (Tr. 336). Alli also answered "yes" when questioned if he had been present with friends "who stole property from somebody else" when he was 16 or 17 years old. (Tr. 336-7). On cross-examination, Alli was questioned further about his involvement as a juvenile in a robbery that allegedly occurred on August 1, 1992. Some of Alli's answers were inconsistent. He first testified that he did *not* attempt a robbery on the date in question. (Tr. 352). He also stated that he was with some friends on that date, but that he and his friends did not attempt to take property from someone. (Tr. 353-4). Next, he testified that he was present when his friends took property from someone, and that he couldn't remember if he had admitted on March 9, 2003 that he attempted to rob someone. (Tr. 354). Alli explained that on that day he knew his friends were approaching a person to steal from him or her, and saw his friends go over to the person, but that he was not with them. (Tr. 466). Alli testified that he later

admitted to being part of the attempted robbery. (Tr. 467). He further testified that on that day in 1992, he told the police his name was Rudy Jerome; Alli's full name is Rudolph Jerome Alli. (Tr. 414-15).

Alli was also questioned on cross about the $350.00 he claimed was stolen from his pocket the night the defendants allegedly robbed him. The money was Alli's salary for his job; he had been paid $600.00 the Friday before the alleged robbery and was carrying the remaining cash in his pocket. (Tr. 356-57). Alli testified that on the night of the incident when he was seen at the hospital for injuries he sustained, he informed the hospital staff that he was not married, although he was. (Tr. 429). He also provided the hospital with a false social security number. (Tr. 429). Additionally, when initially questioned by the police, Alli gave the police his mother's address instead of the address of his home located just above the bar. (Tr. 430-31).

**2.     Testimony of NYPD Detective Ronald Agunzo**

On the night of January 20, 2001, NYPD Detective Ronald Agunzo ("Agunzo") was on-duty with Lieutenant Mark McDermott doing a multi-agency inspection of various bars throughout the 102nd precinct. (Tr. 515). Agunzo and approximately six to eight other officers arrived at the Golden Arrow Bar on the night in question to inspect the premises. (Tr. 516). Around 12:30am, Agunzo and the other officers he was with were approached by Rudolph Alli. (Tr. 518-19). Agunzo described Alli as looking like had been beat up. According to Agunzo, he had bruising on his face, a laceration over his eye, a lot of swelling, bleeding from the eye, a cut on his lip, and he complained of back pain. (Tr. 519-20). Alli gave Agunzo a description of his alleged attackers, whom he described as "three male Indians wearing dark colored clothing." (Tr. 521). Agunzo and McDermott then proceeded on foot in the direction that Alli pointed them.

While walking down 107th Street, a quiet residential block, the officers heard voices coming from the rear yard at 101-59 107th Street and saw individuals in a three-foot gap between two garages back there. (Tr. 522-25). The officers approached the area between the garages and saw three individuals "on the floor doing a lot of moving around." (Tr. 525). They announced themselves as police officers and ordered the men to come out. After several demands, two of the individuals eventually emerged (identified as the Petitioner and co-defendant Haripersaud); the third person remained on the ground complaining of leg pain (identified as Punwa). (Tr. 527-9). Alli arrived on the scene by police car approximately ten minutes later and identified the three men as his assailants. (Tr. 530). Agunzo conducted a search of the three-foot area between the garages where the defendants were apprehended and found two rings (both of which had "RA" on them), and a gold chain, which Alli identified as his property. (Tr. 532). Agunzo also conducted pat down searches of the three defendants. He recovered from the Petitioner a wallet (identified by Alli as his own), and from co-defendant Haripersaud a sum of cash totaling $385.69. (Tr. 536-38).

### 3. Testimony of Dhanpatie (aka Praya) Lall

Dhanpatie Lall ("Lall"), the girlfriend of co-defendant Ganesh Punwa and father of his child, was the defense's first witness. (Tr. 679). Lall spoke to Punwa around 4:30 or 5:00 p.m. on Friday January 19, 2001. Punwa informed Lall that he was "going to go out a little bit with the guys," which Lall testified that she understood to mean that Punwa would be going to the Golden Arrow Bar with the Petitioner and co-defendant Haripersaud. (Tr. 681-82). Punwa called Lall again from his cellular phone at 12:20 a.m. and started to tell her that he was leaving the bar to go home. Lall testified that Punwa did not finish his statement because somebody

came up and said 'give me your phone' and then 'give me your fucking phone.' (Tr. 683-84). After that, the phone went dead. Lall did not recognize the voice she heard. (Tr. 684). Lall said she was calling Punwa's phone all night thereafter and kept getting his voicemail. (Tr. 684-85). Lall was informed by Punwa's mother around noon on Saturday that Punwa was in the hospital. (Tr. 685).

On cross-examination, Lall was questioned about the fact that she did not call the police at any time after she heard a strange voice demand Punwa's cellphone during their 12:20 a.m. conversation. (See Tr. 690). Lall admitted that even after she learned on Saturday afternoon of Punwa's arrest, she did not come forward to the police with the information she had concerning the voice she had heard being aggressive towards Punwa on the phone the prior night. (Tr. 690).

            **4.**        **Testimony of Redsford Persad**

Redsford Persad ("Persad") testified next for the defense. He declared that he did not know any of the defendants by name, but recognized all three as people that he had seen regularly at the Golden Arrow Bar. (Tr. 710). Persad also stated he knew someone by the name of "Rudy" whom he saw regularly at the Golden Arrow, identified as Alli. (Tr. 711-12). Persad saw the three defendants and Rudy at the bar on the night of January 19, 2001. (Tr. 713). While seated at the front of the bar, he saw Punwa leave with his cell phone in his hand; he then saw Rudy leave the bar. (Tr. 715). A little after Rudy walked out, Persad testified, he saw the Petitioner and co-defendant Haripersaud leave together. (Tr. 716). At some point later, the police arrived at the bar. Persad remained there until sometime around 2:00 a.m. and did not see Rudy return. (Tr. 717).

        **5.**        **Testimony of Ganesh Punwa**

Punwa testified that on Friday, January 19, 2001, he got off work around 6:00 p.m. and went to meet his friends, the Petitioner and co-defendant Haripersaud, at the Golden Arrow Bar. (Tr. 758-59). Around midnight, he planned to leave with the Petitioner and co-defendant Haripersaud so he went out to make a call to his girlfriend to let her know he was heading home while the others finished their beers. (Tr. 763-64). While standing outside on the phone, he saw Alli approach him. (Tr. 766). Punwa testified that Alli demanded his phone, stating "give me your phone" and "give me your mother fucking phone." Alli then grabbed Punwa by his chain and hit him. (Tr. 766). Punwa testified that he and Alli then "went down" and continued to fight with one another until the Petitioner and co-defendant Haripersaud came out and broke up the fight. (Tr. 766-67). Punwa testified that, once separated from Alli, he saw what he believed to be his chain and wallet on the ground. (Tr. 769-70). Soon thereafter, Punwa maintains, some people came out of the bar that Punwa "thought was [Alli's] friends" so he picked up his chain and his ring and "started running." (Tr. 771-2). Punwa claims that co-defendant Haripersaud picked up his wallet and that co-defendant Haripersaud and the Petitioner started running with him towards 107th Street. (Tr. 772). When they reached the 107th Street intersection, they turned onto 107th and Punwa looked back and tripped and broke his arm and ankle. The weather conditions that night were rain and sleet. (Tr. 773). Punwa's ankle bone was protruding out of his skin when he fell; he started screaming in pain such that his friends came back for him and dragged him to the closest driveway. (Tr. 776-77). Punwa remained in the driveway space with his two co-defendants until the police found them there. Punwa was arrested and then transported to the hospital. (Tr. 781-82).

On cross-examination Punwa was questioned about the men he saw coming out of the bar

just as he and Alli were being separated from their fight.  Punwa testified that he saw four or five

men emerging from the bar coming towards Punwa and his friends yelling "yo, yo, yo."  (Tr.

813-14).  Punwa stated that he was afraid these men would attack him.  (Tr. 815).


### 6.      Testimony of Ramkrishine Haripersaud

Co-defendant Haripersaud testified that around 3:30 p.m. on Friday, January 19, 2001, he

was given a paycheck in the net amount of $424.10 for his employment as an electrician, and that

he promptly cashed that check and went to the Golden Arrow Bar.  (Tr. 917-20).  He met the

Petitioner at the bar around 6:30 p.m.; Punwa arrived approximately 30 minutes later.  (Tr. 923).

Co-defendant Haripersaud testified that he bought a couple of beers and some food, and that

when he left the bar around 12:15 or 12:30 a.m. he had $385.00 in cash in his possession.  (Tr.

920).

Co-defendant Haripersaud attested that he and the Petitioner exited the bar around 12:30

a.m. a couple of minutes after Punwa exited.  (Tr. 926).  When they left the bar they saw Punwa

and Alli rolling around on the ground fighting and went over to them and separated the two.  (Tr.

927).  Co-defendant Haripersaud maintained he grabbed Punwa off of Alli, but that he never

touched Alli.  (Tr. 928).  As to what happened next, he testified: "Then we saw a couple of guys

came out from the bar, I'm not sure how much people it was, and all I heard was Punwa said my

stuff is on the floor, grab it and I just grabbed what I could grab and we ran."  (Tr. 929).  The

three men proceeded to run down 101st Avenue to 107th Street and made a left turn on 107th.

(Tr. 934).  Soon thereafter, Punwa slipped and fell; Co-defendant Haripersaud and the Petitioner

then dragged Punwa to the nearest driveway.  (Tr. 935).  The three men remained at the end of

the driveway near the garage for approximately ten minutes until the police arrived and demanded that they come out. (Tr. 938-39).

### 7. People's Summation

In summation, the Prosecution asserted that Alli had attested to the true events of the night of January 20, 2001. The government argued that the co-defendants had robbed Alli and fled, as Alli had testified, and that Punwa actually broke his ankle while attempting to scale a fence located at the space between the garages where the three defendants were ultimately found by the police. The substance of the Prosecution's closing argument was that the version of events offered by co-defendant Haripersaud and Punwa when they took the stand was untrue and unsupported by the evidence.

The prosecutor made several statements to the effect that the two co-defendants who testified at trial made up their story. For example, she stated: "They feel forced to come up with a story to explain their way out of this situation" (Tr. 1095); "They're telling you the story, I submit to you, ladies and gentlemen, because they are stuck" (Tr. 1098); "They are telling you the story because their backs are to the wall just as there are to the fence on the night of January 19, 2001" (Tr. 1099); "They are telling you the story because they were quite literally cornered by two police officers in a cramped little space in possession of Mr. Alli's property" (Tr. 1099).

At the close of the government's summation, the Petitioner's counsel requested a mistrial or curative instruction on the grounds that the prosecutor's summation "went beyond the bounds of legitimate advocacy" in that she implied to the jury that the defendants were being forced or compelled to take the stand in their defense. (Tr. 1125). The trial judge responded that he believed the prosecutor "did state that the defendants who testified were forced to come up with

-10-

their version because of the evidence against them, not because of legal compulsion. (Tr. 1126).

He also stated: "I will of course again remind the jury that the defendants had no obligation to

testify." (Tr. 1126).[3]  The Petitioner's motion was denied. (Tr. 1127)

### B.      The Conviction and Post-Conviction Appeals

On January 14, 2003, the Petitioner, Punwa and co-defendant Haripersaud were found

guilty of the crimes charged. On February 11, 2003, Petitioner was sentenced to concurrent

terms of five years and one year imprisonment. He is currently incarcerated pursuant to this

judgment of conviction.

On February 26, 2003, the Petitioner filed a timely Notice of Appeal. In his brief to the

Appellate Division, Second Department, Petitioner raised three issues: (1) that the prosecutor

failed in her duty to correct the false testimony of the complainant, Rudolph Alli,  regarding his

involvement in a previous crime; (2) that the prosecutor improperly cross-examined two defense

witnesses; and (3) that the prosecutor's summation denied the Petitioner his due process rights to

a fair trial.  (See Brief of Defendant-Appellant). The Appellate Division affirmed the Petitioner's

conviction, holding as follows:

> The Supreme Court properly limited the cross-examination of the complainant to
> the facts underlying his youthful offender adjudication. The fact that the
> complainant was previously adjudicated a youthful offender may not be used or
> proved to impeach his credibility since an adjudication is not a conviction. In
> addition, the defendant's challenges to various questions posed by the prosecutor
> during cross-examination and comments made during summation, and his claim
> that the cumulative effect of prosecutorial misconduct constituted reversible error,
> are largely unpreserved for appellate review since the defendant either made only
> general objections, or did not request curative instruction when the objections
> were sustained. In any event, the contentions are without merit.

---

[3] No objections to the jury instructions were raised on direct appeal or in this habeas
petition.

People v. Harripersaud, 2004 N.Y. slip op. 00534, 4 A.D. 3d 375 (Feb. 2, 2004). On March 2, 2004, the Petitioner sought leave to appeal to the New York Court of Appeals, raising the same issues he had raised in his brief to the Appellate Division. The New York Court of Appeals denied Petitioner leave to appeal on April 19, 2004. People v. Harripersaud, 2 N.Y.3d 762 (2004). The instant petition for a Writ of Habeas Corpus followed.

## III. Discussion

### A. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review for habeas corpus petitions. For claims that have been fully adjudicated on the merits in state court, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Mask v. McGinnis, 252 F.3d 85, 90 (2d Cir. 2001) (per curiam) (holding that habeas relief is warranted "only upon a showing that the state courts unreasonable applied clearly established *Supreme Court* precedent") (emphasis in original).

In assessing the "contrary to" provision, the Supreme Court has held that a state court's decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529

U.S. 362, 412 (2000).  The "unreasonable application" prong is implicated "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  In this analysis, a determination of the reasonableness of the application of the law is done from an objective, rather than subjective, standpoint.  Id. at 409-410.  Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

**B.     Petitioner's Claims**

Petitioner raises three challenges to his state court conviction on habeas review.  First, he alleges that the prosecutor's failure to correct the false testimony of the complainant, Alli, regarding his participation in an attempted robbery deprived him of his right to a fair trial.  Second, the Petitioner alleges that the prosecutor improperly cross-examined defense witnesses regarding their failure to come forward to the authorities with exculpatory evidence.  And finally, the Petitioner alleges that the prosecutor's summation was improper because in it the prosecutor shifted the burden of proof, denigrated the defense, and vouched for the truthfulness of its own witness.  (See generally Petitioner's Memorandum in Support of Application Pursuant to 28 U.S.C. § 2254 ("Pet. Mem.")).   I will address the latter two claims first.

**1.     Petitioner's Claims of Prosecutorial Misconduct in Cross-Examination and Summation are Procedurally Barred and Otherwise Without Merit**

The Appellate Division held that the Petitioner's challenges to the prosecutor's questioning of defense witnesses during cross-examination and to comments made by the

prosecutor during summation, and his claim that the cumulative effect of this prosecutorial misconduct constituted reversible error "were largely unpreserved for appellate review" and in any event "without merit." Harripersaud, 2004 N.Y. slip op. 00534. The Appellate Division rested its decision on New York C.P.L. § 470.05[2], which preserves for appellate review only those questions of law as to which "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." Id.

It is well established that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 2000); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 n.4 (2d Cir. 2000) ("where a state says that a claim is 'not preserved for appellate review' and then rules 'in any event' on the merits, such a claim is not preserved"). New York C.P.L. § 470.05[2] is an adequate and independent state procedural rule. Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999).

Here, the Appellate Division explicitly stated that the Petitioner's claims of prosecutorial misconduct were unpreserved pursuant to C.P.L. § 470.05[2], thus the claim has been decided on an independent and adequate state ground. The alternative holding on the merits does not obviate application of the procedural bar doctrine. See Harris, 489 U.S. at 264 n.10 ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding . . . as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision") (emphasis in original). Therefore, the Petitioner's claims of prosecutorial misconduct alleged in

Points Two and Three of his Memorandum of Law in Support of his petition are procedurally barred from habeas review.

Although these claims have been procedurally defaulted, the Petitioner can overcome the procedural bar if he can either (1) demonstrate that the failure to consider the federal claim will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person, or (2) show good cause for the default and that he will be prejudiced by non-review of the claim. See Harris, 489 U.S. at 262; Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996). The Petitioner has made no such showing; he has neither demonstrated that he is actually innocent, nor has he shown good cause for the default and prejudice therefrom. As a result, this court need not review the claims on the merits.

Notwithstanding the fact that a review on the merits is unnecessary in light of the Petitioner's procedural default, in the interest of being thorough, I will address the merits of the Petitioner's claims of prosecutorial misconduct. On the merits, the prosecutorial misconduct claim is nonetheless denied.

Habeas relief is warranted on a prosecutorial misconduct claim only if the prosecutor's comments "constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights. Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). To succeed on this claim, the Petitioner must show that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). " Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). To determine whether

the Petitioner has suffered actual prejudice from any error which may have occurred, the court considers the following:  (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct.  See Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir.1991).

The Petitioner challenges the propriety of the prosecutor's questioning during the cross examinations of Dhanpatie Lall, the girlfriend of Punwa, and of co-defendant Haripersaud.  In both instances, the prosecutor questioned the witnesses about their failure to inform the police of potentially exculpatory evidence.  (See Pet. Mem. at 21).  Petitioner asserts that he is entitled to habeas relief because "the prosecutor's impeachment of these witnesses with evidence that they had not immediately come forward with an exculpatory version of the facts was improper and highly prejudicial to the petitioner."  (Id. at 21-22).

The Petitioner also objects to the prosecution summation.  He argues: "The dominant theme of the prosecutor's summation was that co-defendants Punwa and Haripersaud had fabricated their testimony because 'they felt forced to come up with a story' because 'they were stuck.'"  (Pet. Mem. at 27 (quoting Tr. 1096-99)).  The Petitioner's claim is that "[t]his argument was a blatant accusation that the defendants had perjeriously tailored their testimony after they were confronted by the prosecution's case."  (Pet. Mem. at 27).

Turning first to the cross-examinations of Lall and co-defendant Haripersaud, the prosecutor's questioning cannot be said to constitute "egregious misconduct."  The Petitioner relies on People v. Conyers, 52 N.Y.2d 445 (N.Y. 1981), and People v. DeGeorge, 73 N.Y.2d 614 (N.Y. 1989) to suggest that the prosecutor's questioning violated New York law.  This reliance, however, is misplaced.  The New York Court of Appeals has held that, as a general

matter, silence at the time of arrest cannot be used against a defendant for impeachment purposes. Conyers, 52 N.Y.2d at 458. However, in DeGeorge, the Court of Appeals stated the following: "To be distinguished are those limited cases in which evidence of silence has been admitted to impeach the credibility of a defendant who takes the stand because the circumstances justify the inference that the evidence is more consistent with guilt than innocence." DeGeorge, 73 N.Y.2d at 619. Co-defendant Haripersaud took the stand and presented his version of events, namely that he was attacked by Alli, feared that men who exited the bar were Alli's friends and would further assault him, fled the scene, and went into hiding with his two friends despite the fact that one was severely injured. Given this testimony, the prosecutor did not act improperly in questioning co-defendant Haripersaud on cross-examination as to why he did not report the alleged assault to the police and as to why he did not seek help for his injured friend. Co-defendant Haripersaud took the stand, and in light of his testimony, the prosecutor was justified in bringing to the jury's attention his silence and the inference "that the evidence is more consistent with guilt than innocence." Id. Therefore, I find no egregious misconduct on the part of the Prosecution in this respect.

The same is true with regard to the questioning of Lall. "Under New York law, while a witness has no obligation to volunteer exculpatory information to police officers, that witness' previous silence may be used to impeach her testimony at trial in appropriate circumstances, such as where she is a family member or close friend of the defendant." Otero v. Eisenschmidt, No. 01 Civ.2562, 2004 WL 2504382, at *24 (S.D.N.Y. Nov. 8, 2004); see People v. Dawson, 50 N.Y.2d 311, 317-18 (N.Y. 1980). Given Lall's close relationship to Punwa, impeachment of Lall in this manner was not improper.

That a proper foundation may not have been laid before questioning Lall or co-defendant Haripersaud  (see Pet. Mem. at 23) is at most mere trial error.  Even assuming arguendo that there was some misconduct on the part of the prosecutor in her questioning of co-defendant Haripersaud and Lall, the Petitioner did not suffer "actual prejudice" as a result, nor can it be said that the questioning had a "substantial and injurious effect or influence in determining the jury's verdict."  Scully, 41 F.3d at 824.  There was overwhelming evidence presented at trial of the Petitioner's and his co-defendants' guilt.  The jury was properly instructed as to what does and does not constitute evidence (Tr. 1141-43, 1153); as to their role in assessing the witness' credibility and in determining the facts of case (Tr. 1135-40); and as to the proper burden of proof in a criminal case (Tr. 1132-33).  I find that, to the extent that there was any degree of misconduct, there was no actual prejudice to the Petitioner as a result.  Thus, on the merits, this petitioner's claim based on the cross-examinations of Lall and co-defendant Haripersaud is denied.

The claim of prosecutorial misconduct arising from the People's summation is equally unfounded.  The Petitioner claims that the prosecutor's argument in summation, which challenged the veracity of the testimony put forth by the Petitioner's co-defendants,  "was a blatant accusation that the defendants had perjuriously tailored their testimony after they were confronted by the prosecution's case."  See People v. Negron, 161 A.D.2d 537, 539 (N.Y. App. Div. 1991) (conviction reversed and remanded for new trial where the prosecutor maintained "both in an aggressive cross-examination and in his summation" that defendant "had abandoned an earlier misidentification defense, when he thought an alibi stance would not pass muster, in favor of [a] supposedly sham defense crafted as an afterthought when the People rested.").  The

facts of the present case are distinguishable from <u>Negron</u>. Here, the prosecutor did not suggest that the defendants changed their defense theory in response to the government's case. She merely questioned the credibility of the co-defendants who took the stand and urged the jury not to credit their version of events given the overwhelming evidence of guilt. In doing so, the prosecutor did not act inappropriately.

Moreover, each time the defense objected, the judge considered the objection and instructed the jury accordingly. For example, at one point during summation the prosecutor stated, "And [the defendants] are caught red-handed. So what do they do? They feel forced to come up with a story to explain their way out of this situation." (Tr. 1095). The Judge sustained an objection and reminded the prosecutor to "make it clear" that she was arguing to the jury and not making a statement of fact. (Tr. 1095-96). At trial, the judge properly instructed the jury that only evidence presented could support their verdict, and that arguments and questions by counsel do not constitute evidence. (Tr. 266, 1132-36). The burden of proof was also clearly explained to the jury in its instructions (Tr. 1132-33), and the prosecutor's summation did not shift that burden.

In light of the curative instructions given to the jury and the overwhelming evidence of the defendants' guilt presented at trial, any minor misconduct on the part of the prosecutor during summation which *may* have occurred did not result in actual prejudice to the Petitioner. See <u>Bentley v. Scully</u>, 41 F.3d at 824; <u>Gonzalez v. Sullivan</u>, 934 F.2d at 424. The "[c]ourt must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." <u>United States v. Young</u>, 470 U.S. 1, 12 (1985). Here, I find the prosecutor's remarks to have been a fair response to defense counsels' summations and a fair

comment on the evidence. Accordingly, the Petitioner's argument fails on the merits because he has failed to show an egregious error or actual prejudice. The Petitioner's claims of prosecutorial misconduct based on the government's summation and the cross-examination of defense witnesses are therefore denied, both on procedural grounds and on the merits.

### 2. Petitioner's Claim that the Prosecutor Failed to Correct False Testimony is Without Merit

To address the Petitioner's claim that his due process rights were violated by the prosecutor's failure to correct the allegedly false testimony of Alli, it is necessary to look closely at relevant portions of the trial transcript. The critical fact surrounding this claim is that prior to the commencement of the defendants' trial in this matter, it was disclosed that the complainant, Rudolph Alli, had been adjudicated a youthful offender ("YO") in 1992 when he was under the age of eighteen. Alli was charged with having participated in an attempted robbery, and he pled guilty, which led to his YO adjudication. On direct examination, the prosecutor questioned Alli about his involvement in the attempted robbery. The questioning was as follows:

> Q: Sir, did you also have a case about 10 years ago, when you were either 16 or just going on 17 years old, in which you were present with friends who stole property from somebody else?
> A: Yes.

(Tr. 336-37). Before cross-examination of Alli began, the prosecutor and defense counsel discussed the admissibility of Alli's YO adjudication. The discussion began when counsel for co-defendant Haripersaud made an application that the government turn over any records in its possession of Alli's adjudication. The judge responded:

| | |
|---|---|
| THE COURT: | The obligation is if a witness has a prior record that [the government] inform the defense of that and I believe that was done. |
| [PROSECUTOR]: | Yes, it was, Judge. |
| THE COURT: | And I'll rule on further turn over applications if they become necessary. |
| GOLDENBERG[4]: | Just one thing, I believe the Court made a ruling that we cannot bring out the youthful offender of Mr. Alli. |
| THE COURT: | You can ask the facts. |
| GOLDENBERG: | My question to you is if he either says he doesn't remember or he denies, am I allowed then to go to do you remember pleading guilty, getting youthful offender? |

(Tr. 347-48). At this point in the proceeding, the prosecutor drew the court's attention to the case of In the Matter of Shawn R, 145 A.D.2d 637 (App. Div. 1988). In that case, the New York court considered the validity of a juvenile delinquency adjudication in which a witness who testified on behalf of the juvenile-defendant was impeached on cross-examination with a prior juvenile delinquency adjudication of his own. The witness denied the previous adjudication, and the Family Court allowed, over objection, the introduction of independent evidence to prove the adjudication. 145 A.D.2d at 638. The Family Court reasoned that a finding of delinquency for a juvenile is the equivalent of a criminal conviction for an adult, and thus could be proven by extrinsic evidence. The Appellate Division disagreed, holding that under the Family Court Act, a juvenile delinquency adjudication is not a conviction and "cannot be used or proved to impeach a witness's credibility." Id.

The prosecutor in the instant matter argued that In the Matter of Sean R., though addressing a juvenile delinquency adjudication, presented "essentially [ ] the same rules that govern youthful offender." (Tr. 348). Defense counsel urged that Sean R. did not control, but

---

[4] Goldenberg represented the Petitioner at trial.

the trial judge ruled otherwise:

> THE COURT:        [Y]ou may refresh his recollection by asking if he
> remembers some of the facts of the case and whether he
> ever admitted to anyone that he did it.

(Tr. 350). On cross-examination by counsel for the three co-defendants, Alli was questioned

several times about the facts underlying the YO adjudication:

> Q:[5]    On August 1, 1992, did you attempt a robbery?
> A:    No.
> Q:    On March 9, 1993, did you admit to attempting a robbery?
>     PROSECUTOR:    Objection, Judge.
>     THE COURT:    Objection overruled. On that date did you ever tell
>     anybody that you had tried to rob someone?
>     WITNESS:    No.
>           *          *          *
> Q:    On August 1, 1992, were you with some friends?
> A:    Yes.
> Q:    With your friends, did you and your friends attempt to take property from
>     someone?
> A:    No.
> Q:    Did your friends take property from someone?
> A:    Yes.
> Q:    Were you present?
> A:    Yes, I was there.
> Q:    And do you remember on March 9, 1993 admitting that you attempted to
>     take property from someone?
> A:    I can't remember.
> Q:    You can't remember?
> A:    No.
>     THE COURT: What day are you talking about?
> Q:    August 1st?
> A:    Yes.
> Q:    And your friends gathered around someone?
> A:    Yes.
> Q:    And how did they take the property?
> A:    Excuse me?
> Q:    How did they take the person's property?
> A:    They didn't take nothing from nobody.

---

[5] This line of questioning was conducted by Mr. Goldenberg, counsel for the Petitioner.

Q:      They tried to, correct?
A:      Yes, they tried to.
Q:      How did they try to do it?
A:      I don't know.
Q:      Were you there?
A:      Yes, I was there, but I [sic] they was talking to the guy.
Q:      You didn't do anything?
A:      I didn't do anything.
Q:      You didn't admit to doing anything?
A:      No.

(Tr. 352-55). Counsel for co-defendant Punwa similarly questioned Alli on cross-examination

regarding Alli's YO adjudication:

Q:      This incident back in 1992 that people have been asking you about, the
        August incident, I believe it was August 1st, you recall the incident people
        are talking about, correct?
A:      No, what are you talking about?
Q:      The time you were with three of your friends, you remember?
A:      Yeah.
Q:      As a group, a person was approached, correct?
A:      Right.
Q:      Her property was taken from her, correct?
        PROSECUTION:      Objection.
        THE COURT:          Overruled.
Q:      Correct?
A:      No.
Q:      No; what happened?
A:      What happened?
Q:      What did you see happen?
A:      They told me that they was going to play with the person and then they did
        and the person called the cops and locked all of us up.
Q:      And when they said play with the person, like, you mean like play ball?
A:      No.
Q:      Or steal something?
A:      Steal something.
Q:      So you knew what they were going to do?
A:      Yes.
Q:      And you saw them go over to this person to do that?
A:      Correct. But I wasn't with them.
Q:      But you weren't with them?
A:      Right.

-23-

| Q: | You were not part of it? |
|---|---|
| A: | Correct. |
| Q: | It was just the three of them that were involved? |
| A: | Correct. |
| Q: | And then later on as the case – as this proceeded, you admitted to being part of it, correct? |
| A: | Well, I was there, I got caught. |
| Q: | But you admitted to being part of it, correct? |
| A: | Correct. |
| | *          *          * |
| Q: | You were asked are you admitting to being involved in this incident, you said yes, correct? |
| A: | Correct. |
| Q: | But you just told us that you were not involved? |
| A: | Because I didn't take nothing from nobody, I was just hanging around with people that did something that they not supposed to do. |

(Tr. 465-68).[6]

Subsequent to this questioning on direct and cross, the YO adjudication of Alli was

discussed again away from the jury. The defense argued to the trial judge that the court had

effectively allowed Alli to commit perjury on the stand because to the extent that he claimed he

did not participate in an attempted robbery in 1992, he directly contradicted his plea of guilty to

the crime for which he was adjudicated a youthful offender. (See Tr. 501-504). The prosecutor

argued in response that case law made it clear that a YO adjudication was not a conviction, but

rather only a collateral issue which could not be proven extrinsically to impeach the credibility of

a witness. (See Tr. 504-506). The government further maintained that Alli had testified

truthfully with respect to the material elements of the crime underlying his YO adjudication in

that "he said he was there, he said he was with friends, he said he knew the friends were going to

---

[6] On cross-examination by counsel for co-defendant Haripersaud, it was elicited from Alli that he had discussed the August 1, 1992 "incident" with the district attorney in advance of trial. (Tr. 413-14).

rob this person, he said the friends did attempt to rob that person . . .", and he made it

"abundantly clear that he was in trouble with the police in 1992 and that he admitted an

involvement in an attempted taking of property."  (Tr. 504-505).  After hearing these arguments,

the trial judge denied the defendants' motion to alert the jury – either through stipulation, judicial

notice or additional testimony – of the fact that Alli pled guilty to the attempted robbery charge.

(Tr. 505).

On appeal and here on habeas review, the Petitioner argues that the Prosecution

committed misconduct in violation of the Petitioner's due process rights by failing to correct the

allegedly false testimony of the complainant, Alli, regarding his plea of guilty in the 1992

attempted robbery.  (See Pet. Mem. at 16-17).  Relying on In the Matter of Sean R., the Appellate

Division held that "[t]he Supreme Court properly limited the cross-examination of the

complainant to the facts underlying his youthful offender adjudication.  The fact that the

complainant was previously adjudicated a youthful offender may not be used or proved to

impeach his credibility since an adjudication is not a conviction."  Harripersaud, 2004 N.Y. slip

op. 00534, at * 1.  The Petitioner seeks habeas relief on the following ground:

> The claim asserted by the petitioner was not simply that the trial judge had abused
> his discretion by limiting the scope of Alli's cross-examination. . . . [but rather
> that t]he essence of the petitioner's claim was that Alli had lied about his
> participation in a robbery and had compounded his deception by lying about the
> fact that he had admitted that he had committed the crime.

(Pet. Mem. at 20).  Thus, the petitioner maintains that because the false testimony claim was not

addressed by the Appellate Division, the state court did not identify the correct governing legal

rule and its decision therefore did not represent a reasonable application of clearly established

federal law, and habeas relief is thus warranted.  (Id. at 20-21).

To begin, the court notes that review of this claim is governed by section 2254(d)(1) of the AEDPA, and the "unreasonable application of" clearly established federal law standard.[7]  See Williams, 529 U.S. at 404-406.  Under this standard, the state court's determination is due deference and this court will issue a writ only if the state court applied federal law in an unreasonable manner.  Id. at 410.  Here, both parties agree that the applicable established Supreme Court law is set forth in Napue v. Illinois, 360 U.S. 264 (1959) and United States v. Agurs, 427 U.S. 97 (1976).  In Agurs, the Court stated the following: "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  Agurs, 427 U.S. at 103; see also Napue, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the state, must fall under the Fourteenth Amendment. . . . The same result obtains when the State, although not soliciting false evidence, allows it go uncorrected when it appears. . . . The principle . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

_____

[7] I find that this claim was fully adjudicated on the merits by the Appellate Division and is therefore subject to deference under AEDPA.  See Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) ("For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.").

On the record before the court, it cannot be said that the state court determination was an unreasonable application of the law set forth in Agurs and Napue. The prosecutor fulfilled her obligation in turning over to the defense the fact that Alli had a YO adjudication, and Alli's credibility was in fact impeached at trial with the facts underlying the adjudication. Moreover, it is far from established that the prosecutor "knowingly" allowed perjured testimony to be offered or permitted such testimony to go uncorrected. For one, there has not been a sufficient showing by the Petitioner that the prosecutor knew any more of the facts surrounding Alli's arrest and subsequent plea of guilty than the information to which Alli testified. Thus, I cannot rule that the prosecutor knew Alli's testimony was false. Additionally, Alli's testimony does not appear to have been false in any significant manner. Although Alli's testimony was somewhat inconsistent and confusing, the substance of his involvement in the attempted robbery was made clear to the jury. He was present when his friends knowingly attempted to rob a person; Alli knew of their plans, participated to some degree in the plan, and admitted his involvement therein. On these facts, I cannot find that Alli's testimony was necessarily false.

Given that Alli's testimony cannot be shown to have been false and that the prosecutor cannot be shown to have known the testimony was false (if it had been), I conclude that the state court did not unreasonably apply the established Supreme Court precedent of Agurs and Napue. Moreover, even assuming arguendo that the testimony of Alli was to some extent misleading, habeas relief is still unwarranted because there is not a reasonable likelihood that such testimony could have affected the judgment of the jury. See Su v. Filion, 335 F.3d 199, 126-27 (2d Cir. 2003) (requiring a showing of prejudice even if prosecutor permits or fails to correct known false testimony to support issuance of writ). Alli's credibility was at issue in this case as he was the

complainant and the only eye-witness to the crimes alleged. However, his credibility was impeached both by the YO adjudication and other previous bad acts. See id. at 127 (for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness) (citing United States v. Helmsley, 985 F.2d 1202, 1208 (2d Cir. 1993)). Furthermore, given the overwhelming weight of the evidence against the defendants offered at trial and the fact that it would have been eminently reasonable for the jury to not credit the testimony of co-defendants Haripersaud and Punwa, it is not reasonably likely that clarifying Alli's plea of guilty would have affected the outcome of the trial. Compare Filion, 335 F.3d at 129 (reversing denial of prisoner's habeas petition due to prejudice resulting from prosecutor's failure to correct false testimony where the evidence was "not overwhelming either way").

The Petitioner's claim of a due process violation resulting from prejudice incurred by the prosecutor's alleged failure to correct the allegedly false testimony of Rudolph Alli is denied.

## IV. Conclusion

For the reasons set forth above, the Petitioner's claims of prosecutorial misconduct in cross-examination and summation, and of denial of due process in the prosecutor's failure to correct false testimony, do not warrant habeas relief under AEDPA § 2254(d). The petitioner's petition for a writ of habeas corpus is therefore denied.

SO ORDERED.

Date:  February 27, 2006          _____/s/_____
       Brooklyn, N.Y.             Nicholas G. Garaufis
                                  United States District Judge